210

(No. 57871.—

ANDREW CAMPBELL, Appellee, v. THE INDUS-
TRIAL COMMISSION *et al.* (Keystone Consolidated
Industries, Inc., Appellant).

*Opinion filed December 16, 1983.*

Robert W. Scott, of Swain, Johnson & Gard, of Peoria, for appellant.

Paul G. Bradshaw and Chester C. Fuller, of Peoria, for appellee.

CHIEF JUSTICE RYAN delivered the opinion of the court:

Claimant, Andrew Campbell, was employed by Keystone Steel and Wire Company. On July 6, 1979, while working on a platform about six feet off the floor, an explosion occurred, spraying the claimant with molten steel on the hands, forearms, left thigh, and buttocks. Claimant either fell, or was knocked from the platform on which he was working as a result of the explosion. The claimant sought benefits under the Workmen's Compensation Act. Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*

The arbitrator awarded claimant 51⁵/₇ weeks of temporary total disability under section 19(b) of the Act and stated that the disabling condition "is temporary and has not yet reached a permanent condition" (Ill. Rev. Stat. 1979, ch. 48, par. 138.19(b)), 51⁵/₇ weeks being described as having accrued intermittently from July 6, 1979, to September 4, 1980. On review, the Industrial Commission found petitioner's temporary disability extended only from July 6, 1979, to August 27, 1979, and not thereafter. The Commission found that the claimant failed to prove that the accident aggravated his preexist-

ing mental condition.

The circuit court of Peoria County found that the decision of the Industrial Commission was against the manifest weight of the evidence. The court reversed the decision of the Industrial Commission and reinstated the award and decision of the arbitrator. The employer has appealed directly to this court pursuant to our Rule 302(a)(2) (87 Ill. 2d R. 302(a)(2)). There is no dispute that the defendant suffered physical injuries as a result of the accident. The question in dispute is whether the accident aggravated a preexisting mental condition, causing the claimant to be temporarily totally disabled after his physical disability had ended.

Following the accident, the claimant was hospitalized and treated for his physical injuries. He was treated by Dr. Robert Martin, the company's doctor. The claimant was released from the hospital on July 18, 1979. Dr. Martin continued to treat him for his physical injuries, and on August 22 issued a modified work release calling for no use of the right arm because of muscle tightness in claimant's neck. The claimant returned to work under this restriction on August 27 and was given a job of answering telephones in an office located near the platform where the accident had occurred.

On August 29, 1979, the claimant returned to Dr. Martin complaining of severe headaches and increased back pain. The doctor conducted a neurological examination which he found to be normal and ordered an EEG and a brain scan. On September 6 he discussed the results of these tests with Dr. McLean, a neurologist. The test revealed abnormal EEG findings. On September 7, because of these abnormal findings and the continued complaints about headaches, Dr. Martin told the claimant to go home and not to return to work.

On subsequent visits, the claimant exhibited and described bizarre behavior to Dr. Martin. Because of this

behavior and the persistent headaches, Dr. Martin suggested a psychiatric examination. The claimant agreed to see Dr. Remolina, a psychiatrist whom he had previously seen. Dr. Martin stated that because of the claimant's refusal to discuss anything about his home life at the time he sent the claimant to Dr. Remolina, he thought that something in the claimant's home life might have triggered this episode. He later contacted Dr. Remolina and asked if the claimant had been willing to discuss his home life. Dr. Remolina stated that he had not. Dr. Martin asked Dr. Remolina if it was likely that his home life was a precipitating factor. The psychiatrist stated that it was very likely it could have been a home problem since that was the only thing the claimant was really hesitant to open up about. Dr. Martin, however, refused to state an opinion as to the cause of the mental disability, stating that he had not been trained in psychiatry.

About the same time, the claimant consulted Dr. Hugh McMenamin, a doctor of his own choosing, whose consultation report is dated September 28, 1979. In a letter to Attorney Paul Bradshaw dated October 31, 1979, concerning the claimant, Dr. McMenamin stated he had hospitalized the claimant and made arrangements for Dr. Mortimer Beck to evaluate him. Dr. Beck is a psychiatrist and first saw the claimant on October 30, 1979. His diagnosis was that the claimant was suffering from depressive neurosis. He saw the claimant in the hospital on October 30 and 31 and on November 1 and 2. Following the claimant's discharge from the hospital, Dr. Beck saw him approximately once a week through December 1979, and then about every two weeks up to the hearing before the arbitrator on September 3, 1980.

The employer had the claimant examined twice by Dr. Lalit Salva, a psychiatrist. His examinations were conducted on March 30, 1980, and on April 15, 1980.

The records of two prior hospitalizations for mental

problems were introduced. The first one was dated December 15, 1969, and the second admission was on August 7, 1972. The notes concerning the April 1972 admission state that the patient has a history of psychiatric hospitalization of approximately two months in 1970 and the notes further state that he has been hospitalized for psychiatric reasons several times.

At the hearing before the arbitrator, the claimant introduced Dr. Beck's evidence deposition. The employer presented Dr. Salva as a witness and also presented the evidence deposition of Dr. Martin. In addition, the employer also called Dr. Beck to testify.

The dispute in this case primarily centers around whether there was or was not a conflict in the professional opinions of the two psychiatrists. The controlling question, of course, is whether the finding of the Industrial Commission that the accident had not aggravated a preexisting mental condition is against the manifest weight of the evidence.

Dr. Salva, testifying for the employer, stated that in his opinion the accident did not cause any emotional impairment in addition to what existed prior to the accident. Although he stated that any injury causes some emotional problems, the permanent aspect of the claimant's emotional impairment was not caused by the accident. He also stated that he thought the claimant's fears were exaggerated.

On the other hand, Dr. Beck stated that the claimant had a basic paranoid personality that existed before the accident, but that the accident aggravated it and caused the depressive illness from which he was suffering at the time of the hearing. When Dr. Beck gave his evidence deposition, which was introduced into evidence by the claimant, he had not known that the claimant had been previously hospitalized at least twice for mental problems. However, when Dr. Beck testified before the arbi-

trator, after having been called by the employer, he was aware of the claimant's previous hospitalizations and he changed his diagnosis slightly from what he had testified to at the deposition. He also equivocated, to a certain degree, by saying that the claimant's condition is probably related to the accident, "I can't say it's absolutely related *** most probably. But I cannot be sure of it."

During Dr. Beck's testimony, the question arose as to whether the claimant was faking his mental condition. Dr. Beck stated that it was unlikely, but he could not say the claimant was not. He admitted that he had, on a previous occasion, been misled by a patient who claimed to be disabled. Dr. Beck had prescribed the drug Prolixin Decante for the claimant. He stated that the drug would cause a truly sick person to become more organized and less psychotic. If the person were not sick, he would be extremely drugged by the medication and would be sleeping all day, followed by a period of hyperactivity. Dr. Beck stated that he had not noticed any such reactions in the claimant.

However, the claimant testified that he had failed to keep some of his appointments with Dr. Beck "because of the medication he gave me, I would oversleep." Also, Gale Brooks, a friend who lived with claimant and his family, testified that when claimant would first get his shots of the medication, "he just lays around, it really brings him down, you know, and he sleeps, he sleeps." She then described what she referred to as the second stage following the medication. "The second stage is he moves. It's too much energy, he is constantly moving, constantly walking, walking, walking. You can wake up two in the morning and he is going through the house and walking."

Claimant points out, however, that two days after claimant received a shot of the medication, he was interviewed for about two hours by Shirley Wilson, a private

investigator for the employer. She described him as outgoing and stated that he talked about his grandchildren, his puppies with which he was playing, and some construction work that was being done at his house. She noticed no bizarre behavior by the claimant.

Claimant also points out concessions that were made by Dr. Salva, the employer's psychiatrist, who, in contrast to his previous statement noted above, stated that there was a change in claimant's basic personality after the accident which made him less functional. Dr. Salva stated that claimant's paranoid personality weakened his capacity to tolerate stress initially and that he would be more likely to react to injury than another person would. He also stated that the claimant did react to this injury.

There was a considerable amount of testimony by various persons, including the doctors, concerning claimant's behavior, both normal and abnormal, about which the experts were requested to express their opinions. Also, Dr. Salva stated that he would not disagree with Dr. Beck's observations of claimant's behavior because he had not examined claimant during that period of time. Dr. Salva would only say that he had not observed those manifestations when he had examined the claimant.

The Industrial Commission set forth detailed findings in its decision. The first finding, after describing the accident, summarized Dr. Martin's testimony concerning claimant's mental state from the date of the accident until he issued a work release on August 22. The Commission notes that Dr. Martin stated that the claimant was "very relaxed" and in a "very good mental state."

The second finding notes that claimant returned to work on August 27 following the work release and summarizes Dr. Martin's testimony that he took the claimant off work on September 7 because of his alleged headaches and the abnormal EEG findings. The finding fur-

ther states that the doctor noted changes in the claimant's behavior. He became silent and withdrawn and refused to discuss his family with the doctor.

Another finding of the Commission relates to Dr. Beck's testimony. The finding discusses Dr. Beck's original diagnosis and the change in his diagnosis after learning that the claimant had been hospitalized twice before for mental problems. The finding also notes, "Dr. Beck further stated that petitioner's episodes had an 'internal periodicity' of their own, and can occur with or without any external stressful occurrence."

Another finding of the Commission concerns the injection of the drug Prolixin Decante. It specifically refers to Dr. Beck's belief that the claimant was not faking his mental condition because if the drug were administered to a normal person, he would be in a drugged condition and sleep all day, following which he would be restless. The finding then refers to Gale Brooks' testimony as to claimant's behavior following the injection of the medication and to the claimant's testimony about missing appointments with the doctor due to oversleeping because of the medication.

The last paragraph of the findings relates to Dr. Salva's testimony. It states that, in the doctor's opinion, the accident did not cause the permanent aspect of claimant's emotional impairment.

Based on these findings, the Commission found that the claimant was temporarily disabled from July 6, 1979 (the date of the accident), until August 27, 1979 (the date he returned to light duty), and that he failed to prove the accident aggravated his preexisting mental condition. We are not at liberty to reverse the Industrial Commission's findings unless we can say that they are against the manifest weight of the evidence. *Westinghouse Electric Co. v. Industrial Com.* (1976), 64 Ill. 2d 244, 251; *Ferrin Cooperative Equity Exchange v. In-*

*dustrial Com.* (1976), 64 Ill. 2d 445, 448.

Regardless of how claimant may attempt to minimize the differences in the testimony of the two psychiatrists (Dr. Salva and Dr. Beck), the fact remains that Dr. Salva testified that, in his opinion, the accident caused no emotional impairment in addition to that which existed prior to the accident, while Dr. Beck's testimony was to the effect that it had. We thus have a conflict in the medical testimony, and this court has repeatedly stated that it is within the province of the Industrial Commission to resolve such conflicts. *International Vermiculite Co. v. Industrial Com.* (1979), 77 Ill. 2d 1, 4; *Holiday Inns of America v. Industrial Com.* (1969), 43 Ill. 2d 88, 89; *County of Cook v. Industrial Com.* (1974), 57 Ill. 2d 24, 28.

The claimant challenges the credibility of Dr. Salva on various grounds and notes several concessions made by the doctor which, it is claimed, lessen the credibility of his opinion that the accident caused no additional emotional impairment. Likewise, the employer emphasizes certain factors which it is claimed impair the credibility of Dr. Beck's testimony. We have also, on countless occasions, stated that it is the duty of the Industrial Commission to determine the credibility of the witnesses and the weight to be given to their testimony. *Veritone Co. v. Industrial Com.* (1980), 81 Ill. 2d 97, 104; *Riteway Plumbing v. Industrial Com.* (1977), 67 Ill. 2d 404, 408.

There is substantial testimony from lay witnesses, as well as from medical witnesses, from which inferences can be drawn that the claimant's emotional condition was worse after the accident or that it was not. Here, again, it is well established by previous holdings of this court that it is the Industrial Commission that may draw the reasonable inferences from the testimony. *A. O. Smith Corp. v. Industrial Com.* (1977), 69 Ill. 2d 240, 246.

The Industrial Commission obviously gave considerable credence to the employer's contention that the claimant was faking. The Commission summarizes in its findings the testimony of Dr. Beck (claimant's psychiatrist) as to what effect the medication would have on a person who was not ill and then refers to the testimony which showed that the claimant reacted in the very manner the doctor described following the injection of the medication.

Viewing the resolution of the conflicting evidence, the credibility of the witnesses, and the reasonable inferences to be drawn from the evidence in a light favorable to the prevailing party, we cannot say that the decision of the Industrial Commission is against the manifest weight of the evidence.

We must therefore reverse the judgment of the circuit court of Peoria County and confirm the decision of the Industrial Commission.

*Judgment reversed; Industrial Commission confirmed.*